# CASES

## ARGUED AND DETERMINED

### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS THE DISTRICT COURTS, AND THE COMMERCE COURT

---

### CASEY v. BARBER ASPHALT PAVING CO.

(Circuit Court of Appeals, Ninth Circuit. February 3, 1913.)

#### No. 2,161.

MASTER AND SERVANT (§ 121*)—INJURIES TO SERVANT—EMPLOYERS' LIABILITY ACT—SAFEGUARDING MACHINERY—"FACTORY"—"MILL."

Machinery consisting of a mixer, grinder, heater, rolls, and elevators for hoisting materials, all operated by a large gasoline engine, and assembled on a flat car used in preparing the machinery for street paving, and moved from place to place on ordinary railroad tracks according to exigencies of defendant's paving business, was a "factory" or "mill" within Wash. Factory Act March 6, 1905 (Laws 1905, c. 84), as amended by Wash. Laws 1907 (Laws 1907, c. 205), requiring every person, firm, or corporation operating a factory, mill, or workshop where machinery is used to provide safeguards for all shafting, gears, etc.; the word "factory" being deemed to include any premises where steam, water, or other mechanical power is used in the aid of any manufacturing process without reference to whether it is inclosed in a building, the word "mill" being also defined as a common name for various machines which produce a manufactured product, or change the form of raw material by continuous repetition of some action, etc.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 228–231; Dec. Dig. § 121.*

For other definitions, see Words and Phrases, vol. 3, pp. 2642, 2643; vol. 5, pp. 4506–4508.]

In Error to the District Court of the United States for the Southern Division of the Eastern District of Washington; Frank H. Rudkin, Judge.

Action by E. L. Casey against the Barber Asphalt Paving Company. A judgment (192 Fed. 432) for defendant non obstante was entered, and plaintiff brings error. Reversed and remanded, leaving judgment for plaintiff on the verdict in full force.

The plaintiff in error brought this action in the court below to recover damages for personal injuries, alleging in his complaint, among other things, that on the 6th day of August, 1909, the defendant to the action was operating a certain mill, factory, and workshop in the city of Walla Walla, Wash., in the mixing, grinding, and manufacturing of asphalt paving, the plaintiff being one of its employés; that prior to and at the time mentioned the de-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

202 F.—1

fendant negligently and in violation of its duty to the plaintiff and to its other employés, and in violation of the laws of the state of Washington, caused and permitted a certain revolving shaft and coupling which was a part of the machinery of the said mill, factory, and workshop to be left unguarded and in such a condition that the said employés, including the plaintiff, were constantly liable to come in contact with the shaft and coupling while in the performance of their duties, and negligently failed to provide reasonable or any safeguards against damage to them, although such protection could have been effectively given with all due regard to the ordinary use of the machinery; that the defendant negligently left the said machinery, shaft, and coupling in a defective and dangerous condition, with a certain cotter pin unnecessarily and dangerously projecting therefrom in such a position as to be likely to catch and injure the employés; that by reason of such negligence the plaintiff, on the day mentioned, while in the performance of his duty in and about the said mill, factory, and workshop, was caught by the said projecting pin and greatly injured.

The answer of the defendant put in issue the allegations of negligence, and set up as affirmative defenses carelessness of the plaintiff, and that the latter assumed as a part of his employment the risks and dangers incident thereto.

The evidence showed that the defendant corporation was engaged in the business of laying asphalt pavement in streets and roads, and that in the prosecution of its business it maintained and operated certain machinery for the purpose of grinding, mixing, heating, and preparing the crushed rock, sand, cement, and asphalt out of which the pavement is made; that the machinery, except the elevators, was assembled on a car about 60 feet long and about the width of an ordinary flat car, and consisted of a mixer and grinder, a heater, rolls, and elevators for hoisting the materials, all of which were operated by a large gasoline engine. There was also, according to the plaintiff's testimony, a platform on each side of the car, one of which platforms was for the employés to walk on in and about their work, and the other was for use in and about the handling of the wagons. According to the evidence, the car is moved by the defendant as its business requires on ordinary railroad tracks, and is conveyed to the particular point desired by means of a side track constructed from the main track, and the temporary track is then removed, and is replaced when the defendant desires to remove the plant to some other point. The machinery in the center of the car is not covered, but there is a tin roof over the vats and rolls. In addition to the car and its contents, and the platforms and elevators, there were, according to the testimony of the plaintiff, two sheds, built in connection with the plant, for the storage of tools and oil, and also a small office for the company in which a telephone was placed. Six or eight men were engaged in the operation of the plant at the time of the plaintiff's injury. Several photographs of the plant were introduced in evidence, and, as indicating its extent and method of operation, we extract briefly from the plaintiff's testimony:

"I now have in my hand Plaintiff's Exhibit 4. The crushed rock and sand was taken in at this end from the left end of the machine, as shown by the picture.

"Q. How was it taken in? A. It was taken in by this chain of buckets or cups, and was carried up into the rolls, the two large rolls on the left end of the machine, and there heated.

"Q. Where was it taken from? A. From the ground.

"Q. Was there a hopper there? A. Yes; there was a hopper there to place the material so the chain of buckets would catch it and carry it into the machine.

"Q. Go ahead. A. It was taken into the rolls and heated and about the center of the machine it was carried into the elevator there that you see near the smokestack. Then the asphalt was brought to the right side of this picture looking at it this way, and was put into a large vat there. This little derrick between here and the smokestack was to pull up the asphalt from the ground in barrels and put it in the vat. When in the vat they

were heated and transmitted to the center of the plant in the vicinity of this elevator, where the mixer or grinder was, where the asphalt and sand or the asphalt and crushed rock, as the case might be, were ground and mixed together thoroughly. After that the material was transferred into the wagons to be hauled to the streets.

"Q. How was it put into the wagons? A. There was an elevator there that, when the vat was full and thoroughly mixed, the elevator would turn over and the bottom of the box would open and drop it into the wagons.

"Q. Now, how much of this material would be ground through there in a day about approximately? A. I do not remember the number of loads. If my recollection serves me right, I believe they made a wagon load of that material in seven minutes. I may be a little off one way or the other.

"Q. Was it operated all day? A. Yes, sir; it was started up, and, if working properly, was worked all day. It was never shut down for noon, but worked on until night."

Upon the conclusion of the plaintiff's evidence, the defendant moved for a nonsuit, which was denied by the court, and upon the conclusion of all of the evidence the defendant requested an instruction to the jury directing a verdict in its favor, which motion was also denied by the court.

The verdict of the jury was in favor of the plaintiff for the amount sued for—$7,500—and costs.

Subsequently, on motion of the defendant, the court below entered judgment in its favor notwithstanding the verdict, and the case is brought here by the plaintiff by writ of error.

J. G. Thomas and W. A. Toner, both of Walla Walla, Wash., and Bennett & Sinnott, of The Dalles, Or., for plaintiff in error.

Post, Avery & Higgins, F. T. Post, and A. G. Avery, all of Spokane, Wash., for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). An act of the Legislature of the state of Washington approved March 6, 1905 (Laws 1905, c. 84), as amended by an act passed in 1907 (Laws 1907, c. 205), provides:

"That any person, firm, corporation, or association, operating a factory, mill, or workshop where machinery is used, shall provide and maintain in use * * * reasonable safe-guards for all vats, pans, trimmers, cut-off, gang edger, and other saws, planers, cogs, gearings, belting, shafting, coupling, set screws, live rollers, conveyors, mangles in laundries and machinery of other or similar description, which it is practicable to guard, and which can be effectively guarded with due regard to the ordinary use of such machinery and appliances, and the dangers to employés therefrom, and with which the employés of any such factory, mill, or workshop are liable to come in contact while in the performance of their duties. * * *"

Section 2 of the act of 1905 provides that:

"Every factory, mill, or workshop where machinery is used and manual labor exercised by the way of trade for purposes of gain, within an enclosed room * * * shall be provided in each workroom thereof with good and sufficient ventilation," etc.

Section 3 of the act of 1905 provides that:

"The openings of all hoistways, hatchways, elevators, and well-holes and stairways in factories, mills, workshops, storehouses, warerooms, or stores, shall be protected where practicable by good and sufficient trapdoors, hatches, fences, gates, or other safeguards," etc.

Section 4 of the act of 1905, as amended by section 2 of the act of 1907, provides that it shall be the duty of the Commissioner of Labor, annually and from time to time, to examine all factories, mills, workshops, warehouses, warerooms, stores and buildings, and machinery and appliances therein contained to which the provisions of the act are applicable.

Section 5 of the act of 1905, as amended by section 3 of the act of 1907, provides that:

"Any person, firm, corporation, or association carrying on business to which the provisions of this act are applicable, shall have the right to make written request to said Commissioner of Labor to inspect any factory, mill or workshop, and the machinery therein used, and any storehouse, wareroom or store, which said applicant is operating.  *  *  * "

Section 6 of the act of 1905 provides that the employé of any person, firm, corporation, or association shall notify his employer of any defect or other failure to guard the machinery, appliances, ways, works, and plants with which or in and about which he is working, and that the employé may complain to the Commissioner of Labor of any such defects or failure to guard such machinery.

Section 7 of the act of 1905, as amended by section 4 of the act of 1907, provides that whenever, upon examination or re-examination of any factory, mill, or workshop, store or building, or the machinery or appliances therein to which the provisions of the act are applicable, the property so examined and the machinery and appliances therein conform in the judgment of the Commissioner of Labor to the requirements of the act, he shall issue a certificate, etc.; that a copy of the certificate shall be kept posted in a conspicuous place on every floor of all factories, mills, workshops, storehouses, warerooms, or stores to which the provisions of the act are applicable, and that, if the provisions of the act have not been complied with, the Commissioner of Labor shall notify the person operating the mill, factory, or workshop of that fact.

The sole question presented and argued by counsel in this court is whether the plant in question was a "factory, mill, or workshop" within the meaning of the above-mentioned legislation of the state of Washington. The court below held that it was not, for the reason that the plant was not located in a permanent building, and should be likened to a threshing machine, a steam shovel, a wrecking car, and other similar machines and appliances, and to the small concrete and asphalt mixers which are frequently seen in use upon the streets of cities and towns. We are unable to take that view of this plant. That it was built and operated for the purpose of manufacturing out of crude material the finished product with which the defendant company paved streets and roads is not denied. It is true that it was not manufactured in any sort of a house, but we do not understand that a house is an absolutely essential element of either a factory or a mill. It is, of course, readily conceded that a factory usually and perhaps almost invariably embraces one or more buildings, and, where machinery constitutes a part of the factory, such machinery is undoubtedly usually housed; but even at common law the factory is not

limited to the building or buildings, but includes as well the premises or place where its operations are carried on.

In Black's Law Dictionary the word "factory" is thus defined:

"In the English law the term includes all buildings or premises wherein, or within the close or curtilage of which, steam, water, or any mechanical power is used to move or work any machinery employed in preparing, manufacturing, or finishing cotton, wool, hair, silk, hemp, or tow. Later this definition was extended to other manufacturing places."

The statute of Massachusetts defines factory as "any premises where steam, water, or other mechanical power is used in the aid of any manufacturing process there carried on." Revised Laws of Massachusetts 1902, p. 916, c. 106, § 8.

A similar definition is contained in the statutes of Kansas of 1901 (section 6650), in the Annotated Revised Statutes of Missouri (1906, section 10104), and in the General Statutes of Minnesota of 1894 (section 2264). In 26 Cyc. p. 531, it is said, among other things, that:

"Various establishments have been held to be factories or manufactories under certain statutes, and the statutory meaning is sometimes wider than the common definition."

See, also, 26 Cyc. p. 530, and numerous cases there cited.

The real question here is, What is the meaning of the words "factory, mill, or workshop," as used in the above cited statute of the state of Washington? Among the definitions given by Webster of the word "mill" is:

"A common name for various machines which produce a manufactured product, or change the form of raw material by continuous repetition of some action, as a saw mill, a stamp mill, etc."

The title of the act of the state of Washington of March 6, 1905, as well as many of its provisions, are substantially the same as that of the preceding Factory Act of the state entitled "An act providing for the protection of employés in factories, mills, or workshops where machinery is used" (Laws of Washington 1903, p. 40), concerning which prior act the Supreme Court of the state said, in the case of Ward v. National Lumber & Box Co., 54 Wash. 307, 103 Pac. 2:

"The act further provides for ventilation and sanitary conditions, guarding of trapdoors and hatchways, etc.; so that it will be seen from a reading of the act that the evident intention of the Legislature was to protect operatives in factories in every manner and in every particular in which they could be protected consistent with the reasonable operation of the particular factory which was engaged in business. The appellant invokes the rule of ejusdem generis, and insists that the friction wheel, not being specified in the factory act, and not being of the same kind or genus as any of the machinery specially mentioned, does not fall under the head of machinery of other or similar description, and that, therefore, the assumption of risk attaches in this kind of a case. Considering the whole scope of the factory act and the evident intention of the Legislature, we are unable to reach the conclusion contended for by the appellant. There is no doubt that the general rule is that the general word must take its meaning and be presumed to embrace only things or persons of the kind designated in the specific words; but, as is said in 26 Am. & Eng. Ency. Law (2d Ed.) p. 610, the object of the rule in question being not to defeat but to ascertain and effectuate the legislative intent, it will not be applied where the application would be in the face of the evident meaning of the framers of the law. In other words, the maxim

has no application where there is no room for construction but only when the meaning is not apparent from the language itself; and it is also said: 'Nor does the rule obtain where the specific words signify subjects greatly different from one another, for here the general expression might very consistently add one more variety. In such case, the general term must receive its natural and wide meaning.' This is peculiarly the case under our statute, where the specific words signify subjects greatly different from one another, vats, pans, trimmers, cut-off, gang-edger, and other saws, planers, cogs, gearings, belting, shafting, coupling, set screws, live rollers, conveyors, mangles in laundries, etc., all or nearly all being machinery or parts of machinery of different character. We think, in the face of the statute, it would be doing violence to the evident intention of the Legislature to hold that the duty to guard the machinery in question was not imposed upon the millowner; and the testimony is undisputed that this machine could have been guarded without affecting the efficiency of its operation."

The primary purpose of all such legislation is to promote the public welfare by securing the safety of employés; and, as said by Mr. Justice Story in United States v. Winn, 3 Sumn. 209, Fed. Cas. No. 16,-740, cited with approval by the Supreme Court in Johnson v. Southern Pacific Co., 196 U. S. 1, 18, 25 Sup. Ct. 158, 162 (49 L. Ed. 363), the proper course in all such cases "is to search out and follow the true intent of the Legislature and to adopt that sense of the words which harmonizes best with the context, and promotes in the fullest manner the apparent policy and objects of the Legislature."

It is not contended by the plaintiff in error, and it is obviously not true, that the Legislature of the state of Washington by the legislation in question undertook to require the safeguarding of all machinery and like appliances. What it did declare is that every person, firm, corporation, or association operating a factory, mill, or workshop where machinery is used shall, among other things, provide and maintain in use reasonable safeguards for such machinery as that which caused the injury of the plaintiff in error; and we are of the opinion that to say that the plant of the defendant in error is not embraced by the words "factory" or "mill," because not permanently located in a building, is an inadmissible limitation of the scope of the terms of the statute in view of its manifest purposes; and we think the doctrine of the opinion of the Supreme Court in the case of Johnson v. Southern Pacific Co., supra, confirms this view. We see nothing in conflict with it in the fact that the act of March 6, 1905, as amended by that of 1907, contains many specific provisions applying to factories and mills located in permanent buildings, with many rooms and floors.

It results that the action of the court below in granting the motion for judgment notwithstanding the verdict was erroneous, and must be and hereby is reversed, with costs to the plaintiff in error, leaving the judgment entered upon the verdict in full force.